2136 Colony Grill, Inc. v. Colony Grill Development, LLC Mr. Horvath, whenever you are ready. Yes, Your Honor. Thank you. John Horvath of Colony Grill, Inc. Colony Grill, Inc. owns Federal Registration for Word's Colony Grill as far as restaurants. It also owns the Stanford County Grill Restaurant. That restaurant's been around since 1945 at least. It's recognized as the oldest restaurant in Stanford. And by all accounts, it's iconic. It's been on the list of Best Pizzas in America numerous times over the decades. We're here because the District Court erred by not following this Court's long ethical tradition of enjoining holdover licensees. The appellees are holdover licensees. And by doing that, in my view, the District Court has put licensing law in jeopardy. I say that because a rational actor knowing the District Court's decision in this case wouldn't ever license its valuable grants to anyone. Well, that's only if the rational actor thought that this was a generalizable case, right? So the District Court here did rely on the particular facts of this case and the particulars of your client's request. So one thing that I'm kind of interested in is, you know, you say on appeal that you never requested the closures of any restaurants. But your preliminary injunction briefing did say that you expected their restaurants to close, right? You say even if plaintiffs and counterclaim defendants rebrand the existing locations, the likelihood of confusion will inevitably occur. The confusion stems from the appearance that plaintiffs remain affiliated with defendants even after the termination agreements because they're continuing to sell pizza in the same location with the same offerings and the same staff that customers encountered when these were operated as colony grill locations, right? You say that sort of numerous times, right, that you're looking to prevent competition with the former locations in which they operated. What you're saying, independently, you mean for use of the mark, for trade secrets, know-how, and for the non-compete. I thought you might even have a different argument, which might make a difference. So your interpretation of the non-compete was that the licensees can't even operate restaurants in locations where they formerly operated restaurants because those are former colony grill locations. And then the licensees say, well, that would require our restaurants to close. But we should interpret the non-compete not to require that. The non-compete only requires them not to compete with existing locations. And the district court agreed with them, right? But even though the district court agreed with them on the interpretation of the non-compete, in the balance of the equities, it still assumed that granting your request would require the restaurants to close. Is that a problem? Is that inconsistent? Yeah, it's a massive problem. And that's why the court needed to look at each issue independently and balance the harms independently, particularly as Your Honor notes. He rejected the covenant arguments that we made. But that said, you did request that, right? So is it really wrong for the district court to balance the equities based on the terms of your request? Yes, yes. With respect to the trademark issue, absolutely. We need to look at and balance the harms with respect to enjoying and using the trademark. So here, there's a concession in the record in the letter that beginning September 1, 2021, they would rebrand. They would stop infringing the trademark. And so the balance of harms with respect to the trademark is the only... So you're saying the district court was required to balance the equities for each individual thing that you're seeking to enjoin. Absolutely. Particularly since he rejected the other two, the two and three requests. All that was left, he found, a serious question with respect to the trademark. But he does do that for the likelihood of success, right? He treats them separately. He does. But you're saying he doesn't do it for the other elements? That's exactly right. That's exactly right. And that brings him to a very bizarre place because they conceded that they would stop using the mark. This court says they should stop using the mark, but they get to use the mark because allegedly the restaurants were half-closed. Well, they get to use the mark pending trial. I mean, you still might prevail at trial, right? You might, yes. But this court has said unequivocally it's important to enjoin a former licensee because of all of the issues that you know about. Well, we still consider the preliminary injunction factors when we decide whether to enjoin, right? Absolutely. And so even if we thought you had a likelihood of success, what about the argument that there isn't irreparable harm here because you have this agreement in place that set the terms by which the licensees could operate using the mark in exchange for 3% of the profits or whatever it was? So if you end up prevailing, couldn't you just get that 3% retroactive to the date that they stopped paying you? And wouldn't that show that we could compensate you with money damages? We could, but you would ignore Scientology, the Church of Scientology case. Well, instead of just citing the case to me, why don't you explain why there's some harm to you that would not be compensated by those damages? In licensing law, control over the licensee by the owner of the mark is critical. If you lose control, you could abandon the mark. Scientology talked about that. Does that mean that you... Does that preempt any discussion of irreparable harm then? I mean, is that sort of per se irreparable harm? Well, this Court said, because of the necessity of licensure control over the licensee, irreparable harm always flows from a pull over a licensee's unlawful use of the trademark. But that's usually in a situation, right, where there's competition. Here there wasn't any competition. Well, that's not true either. We're the owner of the County Grill, Stanford Restaurant, that's been around since 1945 at least. But you have no control over the operation of that, do you? That's not true. I thought the management of it was in your adversary's hands. In the subsidiary of the adversary. Under a specific management agreement where they need to act on our behalf at all times. And if they fail to do so, then they have a pretty straight breach. Right, but as a practical matter, there is not competition that you're attempting to use the name in some way that's contrary to, consistent to, different from your opponent's, is it? We own the Stanford Restaurant. They're operating elsewhere. When they're operating under the license, they're operating for us, holding benefits newer to us. But the management of the Stanford Restaurant, you are not in control of that, is that? That's correct. The day-to-day operations, opening the doors, supervising the employees, that's right. But they're doing that on our behalf. If you were dissatisfied with that, I assume you could terminate the agreement or you could step in, right? Absolutely. We would have legal control to do that. Okay, but is the way that they are operating the other restaurants, does it do something that you don't want them to be doing? So I understand that they changed the recipes somewhat. Do you object to that? It didn't seem like that was the focus of your argument. But I suppose you could say, well, we want our mark associated with a certain recipe. But why didn't you make that argument? So the evidence is on the student that they changed the dough recipe at least once after termination of the license agreements, did not consult us with respect to that, and went off and did it themselves. This is a decades-old, highly successful restaurant. The pizza dough recipe is critical to that. They're off doing that which they wish without our control. Is there anything in the record there to support? I mean, it seems like there was some suggestion that there's been no intent expressed by your client to open new Colony Grill restaurants. And so these changes, for instance, in the recipe, if you're not opening any new ones, I mean, maybe that's not correct, but again, sort of what is the irreparable harm you're having from that when it's not competition and when there's not an intent to start a new restaurant? The irreparable harm is that a trademark holder needs to have control over the licensee at all times. We currently have no control to the point where they can make changes in the dough recipe for that kind of pizza recipe. I don't recall reading, and maybe I'm wrong on this, that there was any argument here about their diluting the brand somehow. They were just running their restaurants according to the licenses, then they became holdovers, and then so you have that claim. But it seems to be that you have a... I can't see any irreparable harm that can't be remedied by monetary damages. We have one pizza recipe since 1945. After termination of this license agreement, we now have a change by the unilateral to an iconic pizza recipe. I can't imagine what more irreparable harm was than that. It's the pizza that sells the restaurant. It's the goodwill in the pizza itself that is protected by the trademark, therefore doing that which they want without our control. Can I ask two other questions? So you filed your counterclaim in April and then didn't file for the claim injunction until September. So what accounts for the delay? The pandemic, unfortunately. It was right at the time of the pandemic. We're trying to be... Well, you filed the counterclaim at the time. You could have filed for a preliminary injunction at the same time, couldn't you have? We could have. We noted in our counterclaim that given the pandemic, we were reserving our rights. As soon as it became obvious that they were opening up a restaurant in Virginia without our knowledge, without our consent, we immediately filed for the preliminary injunction. There was an additional delay because we were going to... So the thing that made the difference was the opening of the restaurant in Virginia. It showed that they were completely seizing control of a brand as a whole in the licensing. We could not allow that to happen. So your argument is that you thought that it might just be the maintenance of the status quo and you wouldn't worry about that, but opening additional restaurants was too much. But how does the additional restaurant cause you irreparable harm? I mean, if they're changing the recipe or doing something different in the other restaurants, wouldn't they do it even without another location in Virginia? It's taking all of the secrets associated with each recipe and shipping it down to Virginia where we have no knowledge and no control. It's the same issue. So the idea is you were familiar with the operation of the restaurants that were in Connecticut, but you didn't know what was going to be happening in Virginia? Correct. But I assume after the termination of the agreement or the breach of the agreement or whatever you want to call it, you didn't really have control or awareness of what was going on in the restaurants in Connecticut either, right? Well, that's not true. Even the ones where they're not paying the fees anymore? I understand that in Stanford you're the owner and I assume that that means you can observe it, but what about the other locations in Connecticut? So you need to talk before or after termination? Before termination? No, no, I'm talking about after. After. No, they cease, they tend to cease. Right, so then I guess my question is why isn't that itself a lack of control? Why does the opening of the other location in Virginia make the difference that led you to file for the preliminary injunction? Because that went a step too far. So again, it was a pandemic. Everybody was trying to deal with business and restaurants in particular during the pandemic. Creating the situation, a legal bite for that seemed not prudent. Didn't think the court would appreciate it quite frankly. But as soon as it became obvious that they were taking complete control over the business, we stepped in to try to stop them. Okay, can I ask you one other question, which is Colony Grill Incorporated doesn't actually have the right to license the mark, right? That has been delegated by contract to Colony Grill of Stanford. And Colony Grill of Stanford is not an appellee in this case. So does that make a difference? So you've given control of the mark to another entity and that entity has chosen not to appeal. Does that make a difference as to how we balance the factors and decide whether you're harmed? We're the owner. We have the right to enforce our trademark. And we have the obligation to control the use of that trademark. And we see a hold of our licensee taking complete control over our business. And that needs to stop. Every day they can do something to our business that we have no control over. As a matter of trademark licensing law, that's improper. And the mere possibility that they can do harm to us is sufficient to prove irreparable harm. Here we have more than that. We have actual steps where they're taking control of the business. I guess I have one other question, which is the distinction between the prohibitory and mandatory injunction. So the court says, the district court says it's a mandatory injunction because they're going to close restaurants and we've spoken about that already. But doesn't the court also say that even if you had to meet the lower standard for a prohibitory injunction, I still would say that you didn't meet it for the other factors? I believe on two issues, the trademark, excuse me, not the trademark, the trade secret issue and the covenant issue, the court did say that. It said even if it were the lower standard, you didn't meet it. The court did not say that with respect to the trademark issue, which is the focus of this particular appeal. Sorry, when you say it's the focus of this particular appeal, does that mean that all you're seeking on this appeal is an injunction prohibiting use of the mark and not the other ones about know-how and the non-compete? What you said is the primary focus. A secondary focus is to set that un-injunction. Oh, so you still have those claims. So that people can consider them under the appropriate standard. But the second issue compounds all of the difficulties with respect to not un-joining on the trademark and due to Scientology and due to their concession that they were going to re-break it. Okay, well, thank you, Mr. Horvath. Let's turn to the appellee, Mr. Wolfson. May it please the court, David Wolfson, for appellees, the two corporate appellees and the four individual appellees. I want to focus first on what my friend referred to as the independent evaluation of each claim. The court doesn't even have to reach the issue of whether it's appropriate to tell the court  it's not sufficient because, in fact, in the opening, at the hearing, my friend on the other side said that there's all sorts of problems with having them continue to use the Colony Rotita recipes under a rebranded name. So he was telling the district court, look, do not enter an order that merely requires them to change. Yeah, so I guess that's interesting, right? So it is true that they made that argument before the district court. It was an interpretation of the non-compete that they shouldn't be allowed even to operate restaurants in the former locations where they operated restaurants. But when the CGI sought an injunction, they were seeking an injunction against use of the mark, also against use of know-how and trade secrets, and also for the non-compete. So shouldn't the district court have analyzed those separately? It did do that for likelihood of success. So why should it assume that enjoining use of the mark was going to require the closure of restaurants? And here's why. In fact, in fact, and you can incorporate this into your answer, the district court didn't even think that enforcement of the non-compete was going to require closure of restaurants because it agreed with your interpretation of the non-compete. So isn't it very strange that the district court assumes in the balance of the equities analysis that there was going to be closure of restaurants? Because of two things, Your Honor. So the first one is that on the trade secrets, it was undisputed that given their trade secrets plan, the restaurants would have had to shut down. Because the proposed order says that we would be barred from using any recipes or cooking techniques ever used at the restaurant since 2010. And so that would have meant that they could not have served any kind of pizza. Because without saying anything confidential, we're talking about, and you even said it. Well, again, so you're saying that they sought overbroad relief on the non-compete claim and also now on the trade secret claim. Yes. But that still doesn't implicate an injunction against use of the mark. I guess maybe your argument is the district court wasn't required to parse the different claims. But if you heard Mr. Horvath just a few minutes ago, he said that the goodwill is in the pizza. So they had an interesting trademark theory, which is not in their briefing. And they're not arguing on appeal as any basis in the law, because it does not. But they were arguing to the court as part of their trademark claim. So even if you parse that claim and separate it out from the others, as part of the trademark claim, they said, and this was the appendix at 83, the opening on the beginning of the trial, the goodwill protected by trademark laws is pizza recipes and cooking methods, protected by trademark laws. So that was part of the trademark claim. Well, come on. Obviously, the trademark is the name Colony Grill. It's not the recipes. The recipe is the separate thing. They were arguing that it was the pizza. And in their brief, which is out of the way. Well, I mean, the district court should have been able to realize that a trademark doesn't cover the pizza recipe. It covers the use of the mark, right? I mean, that's not. I mean, you're saying because there is some filing where they described the trademark claim as touching upon the use of the recipe, then the district court properly thought that relief on the trademark claim would have been an injunction against use of a pizza recipe? They were arguing in their brief, their supplemental brief, appendix at page 320, filed on June 28, they argued that the concept of residual goodwill covered the pizza. And then my friend on the other side argued the same thing to the district court on the first day of the hearing, of the week-long hearing, that the goodwill protected by the trademark was, is the pizza recipe. Well, it says it's precisely this reason that the parties agreed that following termination of the agreements, Connecticut defendants would no longer operate pizza restaurants in that vicinity. So it seems like they're talking about the non-competes, right? This is 320. This is the page that you were just quoting. The opening on page 83. Right. We'll be able to capitalize on the residual goodwill. Right, but it seems like that's, OK, OK, I understand. So you're saying that they described, your argument is they described the trademark claim in over-broad terms. But let's put that aside for a second. Do you agree that if they are seeking a restraint on use of the mark, that would not require the closure of restaurants? It would just require not using the mark anymore? Well, it would depend how that relief. In fact, Mr. Horvath just said, just said that the goodwill being in the pizza is the reason why they shouldn't be able to use the mark. But, you know, they could sell whatever pizza they want, as long as they don't call it Colony Grill Pizza, because he's worried, or his client is worried that that will alter the perception of the mark. The, well, I have two answers. First of all, when the litigant, the movement, under preliminary injunction, comes to the district court and says, don't just change, have them change the name, what's the district court supposed to do? Mr. Horvath said there are, this is at page 83 of the appendix, there are all sorts of problems with having them continue to use the pizza recipes and cooking methods under a rebranded name. So it was clear to Judge Thompson that they didn't want an order that just changed the name. And that was because... But you're saying maybe they could have gotten that order, but you're saying they essentially waived it by not having that narrow request? Is that your argument? I don't think they... Well, yes, now they've waived it. I think, I think that this court should not create a rule that says that when you go to the district court and ask for relief, you can then go up on appeal and ask for their own relief. I don't think that's a good rule of judicial economy. And let me just explain... Okay, so let's just assume hypothetically, just to be clear on this point. If they had gone to the district court and said, all we want is a preliminary injunction restraining use of the mark, nothing else would have to change except the licensees could no longer call themselves Colony Grill restaurants and could not use the logo. That would have been a completely different case, and maybe they would have gotten that injunction, but you're saying they never made that request. I don't think they would have gotten that injunction for other reasons. Your Honor, so this gets also to Your Honor's question about the delay. They did file that motion. They filed that motion that was the first preliminary injunction motion filed on October 8th of 2020, and then we told them, you know what? The case got so crazy with the trade secrets and so expensive, frankly, and so adversarial, let's say, that we thought, how can we untie the board and not hear? And so we said, you know what? We're going to attempt to change the name. Instead of that lowering the temperature and allowing us to settle the case, they sued the four individuals, they added the claims for the non-competing, and they doubled down on the trade secrets. So we now had two motions in front of the district court. The district court, of course, was intimately aware of that history because we were having conferences every week, and he understood very well, without even Mr. Horvath saying the things that I just read, Your Honor, that they were not asking for a change in the name because we already said we intended to change the name. They wanted to shut down the restaurant. Well, because he didn't enter the order restraining the use of the mark, now you are using the mark, so it seems like, effectively, he sort of authorized the licensees to keep using the mark, right? I mean, I understand that it seemed at the time that you intended to stop using the mark, but now you're not. Yes. So, like, the argument that, well, the district court understood that the licensees were going to stop using the mark is kind of a weird argument to make when they've decided not, that they're going to keep using the mark. No, I'm sorry, Your Honor. I didn't mean to say that, but the district court understood that the accountant and the non-accountant were not asking for an order just to stop using the mark because that's what they had asked for in October of 2020. I see. Okay. And so he understood that what was before him was shut down the restaurants, tell them which recipes they can use and which recipes they can't use, just on the point, if I could, Your Honor, on the point of control. There was no loss of control because there never was any control. In fact, the testimony at the hearing from one of the corporate officers of the Colony of Pearl Hays, Paige James, she said they changed the colony. They named my clients. So when my clients came in in 2010 and 2012, there were no standards. It was complete hodgepodge. But they're still doing it as licensees, right? So all of that refinement of the reputation and the process they're doing as a licensee of Colony Grill Incorporated. So they're really doing it on behalf of Colony Grill Incorporated. So maybe Colony Grill Incorporated liked that at the time and approved of it, but now they've lost any say-so over what happens. The law is that a trademark owner must set standards. And every one of the holdover cases, when you reach those cases... So the license agreement between the licensor and your clients does have quality control standards. No. It doesn't. It does. It says, you know, maintain the high standards associated with the mark, this kind of thing. I understand that might be open to interpretation, but it does suggest that one counterparty could determine that the other counterparty is not living up to it and could decide to terminate the agreement or could raise an issue, right? So it's in the agreement, right? So should we say, notwithstanding the agreement, that they didn't exercise that oversight enough and so therefore they weren't given control? I mean, it's very odd. I guess maybe you can answer this question, which is, your client signed an agreement with the mark holder that says, we're using the mark pursuant to a license. We agree we're not going to challenge the right to license the mark. We agree we're not going to challenge the right to license the know-how. And now you're doing exactly what the agreement prohibits. And when the district court is considering likelihood of success, he doesn't even seem to take much note of the fact that there was this agreement, right? I mean, shouldn't that decisively change the likelihood of success analysis? Well, the likelihood of success analysis on that trademark claim took up very little time. They put on no evidence on that at the hearing and focused instead on trade secrets and the non-competes and their theory of residuals as well. So from the district court's perspective, that didn't seem to be where the disagreement was. But first of all, Your Honor, the trademark defined in those agreements is the common law trademark, not the federal registration that they're talking about here. Right, I know, because the appendix says it's... Yeah, but it's still... I mean, maybe they should focus on that because that's what you agreed to respect, but wouldn't it be a strong claim because you actually have an agreement? Well, you know, there wasn't a lot of time spent at the hearing because it was all about... I mean, is there any argument that the unregistered mark is different from the one that was ultimately registered? Well, it's a different legal document, and in fact, the document makes it very clear that we are not making any representation warranty about it and it might happen down at the PTO. So that's really carved out. All those agreements very carefully say it's only about the common law trademark, and now they're talking about the federal registration. So that's one... Well, I thought your argument was that they can't enforce the agreement because it's become a naked license, not because the agreement applies to a common law trademark and now they're talking about a federal registration. I mean, would that be a reason why the agreement would not be enforceable? Well, it was an argument that we made, but the naked license, this is about as naked as you can get, because they never had any standard. The testimony was... Right, I understand, but you signed an agreement that says we're not going to challenge the mark holder's right to license the mark. Isn't that exactly what you're doing now? That's always the case. Well, if it wasn't, four of my clients did not sign that. So... And they were trying to join four of my clients. Okay? Individuals. Okay, so they're not part of it. So, and that's... Again, they're coming... Yes, but as defined in the agreement, it's the entity that's signing it, not the individual. Unless we're going to throw out corporate existence... Individuals in their individual capacity maybe can use the mark, but they're not the restaurants. The restaurants are operated by the corporate entities, right? Right. Okay. But, Your Honor, if Your Honor is saying that, you know, licensee estoppel is always, you know, as a matter of law, that's not the Idaho potato case... Maybe not always, but doesn't it seem odd that the district court didn't really factor the agreement into the analysis of the likelihood of success? I think he did. I think he did because throughout discovery in our many, many conference calls with the court, he was always mentioning that, and in the discovery disputes, he often mentioned about how... All right, so why don't you just say, so what is the exception to licensee estoppel that you think applies here that allows you to challenge the mark and the licensed know-how? It's a factual analysis that considers the public interest and whether there is going to be any misleading of the public. And in this case, there can be no misleading because we have been for 12 years, 10 years, the only public-facing folks... But isn't the point of signing an agreement where you agree not to challenge the mark precisely to avoid getting into these kinds of arguments? Like, why is that a reason not to enforce the agreement? Because you can come around and make an argument that you should be able to use the mark notwithstanding the agreement. Because it is always the duty and the first principle of trademark law and the first obligation of a trademark holder to set standards and control quality. But then aren't you making the argument that whenever we have an agreement that says a licensee agrees not to challenge the licensor's right to license the mark, it would only be enforceable if the enforcement of the mark was defensible in the absence of the agreement? You're saying the agreement shouldn't make a difference. If you could show that they didn't control and didn't do the other things that a mark holder does, you'd be able to ignore the agreement. So your argument is the agreement doesn't make a difference, right? No, it makes a difference. But it's still... There is no basis of law that I'm aware of, Your Honor, that says that if you have that in your license agreement, you can just wash your hands of the quality control. And now it doesn't matter, and will be held. I don't believe that's the law. And I don't think that would be a good law because it would mislead consumers as to source. The only source here... By the way, the fact that my clients, or entity controlled by my clients, are operating the Stanford store is critical and distinguishes this from every other place because they were not asking my clients to stop being the public face of the brand, of the mark, selling basically the same pizza in Stanford. So how could there be confusion as to what? The only source was my clients, in Stanford, in Arlington, in Florida, up and down the Great East and Connecticut and New York. So there couldn't be any confusion. But again, in Stanford, you're operating the restaurant pursuant to an agreement with a licensor. But now with the other restaurants, you're not doing that. But that agreement delegated all authority. It says rights of certain persons to participate in decisions. It's the appendix at page 506. It's the management agreement. Rights of persons to participate in decisions. And in the next page, it says that the manager says all policies and procedures of the restaurant. So they, in April of 2012, they delegated to my clients all rights. We didn't even have to sell pizza there. We didn't have to call it a grill. So by doing that and giving us... I mean, so let's just consider that for a second. So if, in fact, you stopped selling pizza and you called it something other than Colony Grill. So let's say you changed the Stanford location to Joe's Hamburger Shack and started selling hamburgers. You're telling me that Colony Grill Incorporated would have nothing to say about that. The Stanford location would now operate as Joe's Hamburger Shack and sell hamburgers and never sell pizza again. And there'd be nothing for them to do. We could sell. It says the manager will set all policies and procedures of the restaurant. And then it says... But that agreement is termed as... Changing the name. Changing the name. Any proposed use of the name would have to be subject to prior review. So changing the name, they would have to approve. Changing the food... But the agreement is terminable, right? 99 years. 99 years. And we already had a... They tried to terminate it in AAA arbitration and lost that. Okay. Well, I appreciate the argument. Thank you, Mr. Wolfson. Thank you. Did Mr. Horvath revert?  I don't... Two minutes. Okay. Mr. Horvath for two minutes. Thank you. So this is an odd situation. The appellees have only been licensees under written license agreements. They are pointed out critical provisions. Another one is that if they pulled over, they agree that irreparable harm would be caused to us and the court should enjoin them. And then it's terminated. And so now they're pulled over licensees. But yet they have complete control over the pizza recipe. They have complete control over whether you go to Virginia, Florida. This is not... It's a bizarre situation where the owner is out of control, but a licensee, a holder of a licensee... I think I understand that argument, as you probably can tell. But why don't you respond to what Mr. Wolfson just said, which is that in Stanford, which is the one location where you say that you have control over the brand because they're acting pursuant to an agreement with you, you've actually surrendered control over the operation of the restaurant and the recipes and all the things you're saying. It's dangerous for them to have control over the other locations. We hire them to be the day-to-day manager on our behalf to run the restaurant. That includes who to hire, how much to pay. But they have a fiduciary obligation to run that restaurant on our behalf. And so for him to suggest that they could go off and change recipes or change names... So what would you do in my hypothetical... What would you do in the hypothetical that I articulated where... I mean, we get that there's a difference now in changing the name, I guess you have, to give approval for that. But if they decided to sell hamburgers and not sell pizza anymore, what would be your recourse in the Stanford location? We would demand that they stop. And if they didn't, we would cease the term. Well, what about the idea that it's a 99-year agreement? Well, it's 99 years, but it's terminable for cause. It's not forever, Your Honor. And the cause would be what? Like betraying the standards of the brand or one of those provisions? That they're not acting in accordance with our wishes, not acting in accordance with the way we run the restaurant. They're changing the restaurant, and that would be breaching their duty to us on our behalf as our agents. They're the agents. We're the owner. That's what the agreement says. But none of those particulars are set out in the agreement in terms of the recipes and all of that. I mean, the agreement does just say they have responsibility for the day-to-day, and it prohibits certain things, I guess, with the change in the name, but you say it's for cause. If they did, in fact, change the recipe, how does the agreement establish that as cause? There's only the broad provision, Your Honor, with respect to recipes and food. It says that they need to act on our behalf as our agent in running the restaurant. On your behalf, but not at your instruction? Does it limit in some way that they have to get your approval for those changes, or just that they need to be doing it in your best interest? The agreement doesn't speak to recipes. So when the parties were negotiating this agreement, I don't think they contemplated that an iconic pizza recipe could conceivably be changed by the agents who are holding her license against her. Or what if it wasn't changing that recipe, but just adding items to the menu that maybe you didn't approve of? We're going to sell pizza, we're also going to sell chicken, we're going to sell burgers, we're going to sell seafood. They want to do that. Is that... I believe there are provisions which talk about the menu. So menu items and the name need our approval. Beyond that, it doesn't speak to changing recipes. I don't think anybody contemplated that would even be conceivable. It was done here to avoid a trade secret. It was done in response to our claims, which is unfortunate. One last point. Okay, last point, and then we'll wrap up. Yes. So nowhere did we ask to demand closing of restaurants. We asked for three independent sources of relief. One, W's Trader. Wait, come on. I mean, you did ask for the closing. As we just said, you had an interpretation of the non-compete that said that they couldn't operate the restaurant in the vicinity of their former locations, which would require them to shut down those restaurants. And why wouldn't they be able to sell pizza? Because of your interpretation of the non-compete. So let's say that we don't agree that that's what the non-compete requires or that you would be entitled to an injunction on that point. What should we do with this case? Let's say that we do not agree that the non-compete requires the licensees not to sell pizza in the vicinity of the former locations or that you would be entitled to an injunction preventing them from doing that. But that's on the non-compete claim. What should we do with the rest of the case? Okay. Thank you, Mr. Horvath. The case is submitted and because that is the last argued case on the calendar today, we are adjourned.